Next matter is Plavin v. Group Health Incorporated. Good morning. May it please the court. Hallie Josephs with Sussman Godfrey on behalf of the plaintiff and appellant Stephen Plavin. This is a case about GHI's deceptive conduct in misleading hundreds of thousands of consumers about out-of-network reimbursements. It's really a case about what its consumers mean, right, under the GBL. I know you've got unjust commissioning claims, but let's focus on the GBL because that seems to be the nuts and bolts of it. Absolutely, Your Honor. That is the primary issue on this appeal. And your best case is Oswego? Best case is Oswego, and all of the cases that trickle down from there, you have the Alacqua v. Physicians Reciprocal Insurance case that involved medical malpractice insurance. That was not a case where there was any good or service directed to the public at large. Medical malpractice insurance is only available to licensed medical professionals. And what that case and what other insurance-based GBL claims have repeatedly held is the question is whether there's standardized conduct such that it potentially affected similarly situated insureds. And these courts, both at the New York Court of Appeals level, as well as at the appellate division level, and federal courts applying this law, have all recognized that in the insurance context, harm to numerous insureds is sufficient to satisfy this element of the claim. Who are the folks who are being harmed in the Alacqua case? I'm quoting from the opinion that GBL claims, quote, must be predicated on an act or practice which has the potential to affect the insured. And that act or practice could affect the public at large as distinguished from merely a private contractual dispute. And there was the physicians, right, who were damaged by the practice. Correct. Those were the insureds. They were not informed that they had the right to choose their own defense counsel in malpractice proceedings. And so they thought that they had to take the insureds offered by the insurance company when the incentives and the positions that the insurer and the doctor would take were not always met. But that's just one example. You have repeated cases where the deceptive conduct didn't occur until someone... Do you know, and maybe it's not in the record, and I didn't read the case looking for it, the question just occurred to me. Who negotiated the contracts in Alacqua and Millennium is another case very similar to that. Who negotiated those contracts? You know, was that the individual doctors? Was it the state insurance agent? How did the contract come about? The reason I'm asking that is here the situation is, as I understand it, the contract issue was arranged between the New York Labor Board and unions on one side and the insurer on the other. That seems to me to be very different, a very unique situation. And I'll get into that in a few minutes in terms of what I think the GBL is trying to accomplish. But do you know who negotiated those contracts? I don't know it in those cases, but what I do know is that under the statute, there is no language accepting conduct where there's a contract in the background where there's some sophisticated party that might have given access to the consumers. It's not in the contract, but the whole thrust of 349 and 350 seemed to be almost like an anti-Keviat MTOR situation, that you want to make sure that the, quote, consumer is not taken advantage of by fraudulent actions or fraudulent advertisers. It's not just buyer beware, so you've got a statute there to protect the, quote, consuming public at large. If you have a situation where it's negotiated, and this was NYU. If you have a situation where you have a sophisticated entity negotiating the contract, not just a sophisticated entity, but a sophisticated entry whose interest is that of the people whom you're claiming is the class of plaintiffs here, the union members, it seems like a very different situation than something that could generally impact the overall public. And what am I missing in looking at the case that way? Well, in the NYU case, the sophisticated party was itself the insured, and it was disputing a denial of benefits under a commercial crime insurance policy that it had tailored to its own benefit. There was no well-planned allegation that this was a common act that affected many other universities. I mean, all signs in that case are that it involved a denial of a claim for benefits and a dispute that was unique to that insurance company, and that insured for that particular claim. But here, the dispute is unique to this group of plaintiffs, the union members. Now, I agree, the doctors in Lacroix in the millennium, I'm not quite sure how to look at that, but that does seem to get around that. But the potentially harmed group here is very narrow. You have to be in this union to get this policy. This policy was not offered to anybody living in the Bronx or Manhattan or in New York City. You had to be a member of the union to get this policy. That does seem, even though the numbers are different, like NYU, and the number, it seems to me NYU, they focused on also the cost of the premium. I don't know what the cost was there, but this is a $2 billion premium that was paid, which seems much more akin to NYU. Your Honor, aggregating all of the premiums of the individual insureds and their families is not appropriate in this case. This is about what GHI told consumers. This wasn't a case where there was no interaction between GHI and the insureds. There were 11 plans that insureds could choose from, and GHI was jockeying for a position. It wanted these insureds' dollars. They directed their premiums to be paid to GHI or to one of the 10 other insurance companies that had plans available. That's just one aspect of it was the plan choice. Let me ask you a question. I tended, in the beginning, to think that NYU was applicable until my law clerk persuaded me that this is a case where, although the contract was negotiated between the union, the city of New York, and the company, that because the insurance company, as one of 11 companies offering insurance in New York City, wanted to get the lion's share, it was communicating directly to the employees to get them when they made their selection of what insurance to pick to select the defendant, and that it was this direct communication between the 900,000 insureds and the insurance company that you are concerned about, rather than the negotiation of the underlying contract between the city and the union and the insurance company. Is that an appropriate view to take of the situation? You better say yes. That's called a softball. That's exactly right, Judge Roth. Look at the language of the statute. Deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state, are hereby declared unlawful. It doesn't say, except if you received employer-sponsored benefits, where your employer was there to protect you. The legislature not only did not intend to... If the language is that specific, then NYU would not have decided the way it was. That language is there, but it's got to mean something more than the New York Court of Appeals has said. They've not stopped with that statutory construction. They've looked at whether or not it's a one-shot deal. They've tried to look at whether or not the entity being protected in a particular suit fits within the class of consumers, whether or not something's offered to the general public. I mean, they have taken it very broadly. The bottle of wine case kind of surprised me, but that's not inconsistent with what I think Judge Roth is asking you, or certainly it puts more light on the case than NYU, and maybe Locke was consistent with that. That's right. The New York Court of Appeals has said that in the small case, this statute applies to virtually all economic activity. There are no exceptions for insurance companies. But then you argue more than you have to argue, because if that's the case, then NYU would have been decided differently. I disagree, Your Honor, because... You just said that the New York Court of Appeals looks at this statute and says it applies to all economic activity. NYU was very much economic activity, but this statute didn't apply. And that's because there wasn't potential harm to numerous consumers. There was only a claim of Continental Insurance Company denied this specifically for coverage, and it did so on a bad faith or otherwise improper basis. How our case differs is it's not about Mr. Plavin complaining about how the insurance company handled his hip replacement or other surgery. It's about the uniform standardized treatment that applied to across this group of consumers. And just to address the general public... You said this group. That is where I'm having a problem. Help me with that. You said this group of consumers. When you have a discrete group of consumers, help me understand how that fits into 349 and 350. If the group is, by definition, very, very limited and very contained, and the member of the general public is not eligible to get into that group. Because there is no general public requirement. There's just a requirement that the conduct harm more than the particular plaintiff who's suing. And we established that here with hundreds of thousands of city employees and retirees who received these materials, who were not given access to the fee schedule that had not been touched since 1983. To point you towards two cases that, say, consider and reject this general public requirement. First, you've got the Coke versus Greenberg case, which was the wine cellar case. Yeah, but there, if you had the money, any member of the general public applied. Anybody could have walked into that wine store and paid that outrageous price for some grape juice, old grape juice. So you can't say that doesn't apply to the general public. Well, the Second Circuit there did say the high prices and the specialty nature of those wines that were available at auction did preclude the involvement of the general public. But that doesn't mean that this conduct couldn't be consumer-oriented as a result. Because the language in Oswego and Guidon and other cases is, does the conduct potentially affect other similarly situated insureds? And so with that similarly situated language, that's why you can have what maybe Your Honor would call a discrete group of individuals, even though they number in the hundreds of thousands, but they were still uniformly subjected to this deceptive conduct. But even in Oswego, it happened between two sophisticated entities. But anybody who walked into that bank was going to get, I can't remember the colors now, was going to get a signature card that was coded in a way that would mislead them about whether or not that was an interest-bearing account. Sure, but the courts have repeatedly recognized that members of the consuming public are not all targeted or even have access to certain goods or services across the board. And the Alacla case that I cited earlier about medical malpractice proves that point. The other point I want to make, Judge McKee, you mentioned, I believe, the Emblem Health or Millennium Health case that involved GHI's parent company, who made the exact same argument, except the difference there was that they argued since the conduct was only directed to their members, regardless of where that insurance came from, and the case does not reveal the source of that insurance, but what they argued there was the deceptive conduct that's being complained about is only directed towards people who are already members of our insurance plan. When you say deceptive conduct, can you be more specific? I understand that the insurer had been disseminating some information that you claim was false or misleading, et cetera, et cetera, but it also seemed that some of it was inadvertent. Can you be more specific about how the insurer violated New York's consumer law? It is New York consumer law that applies, or insurance law. Are you referring specifically to Section 4226 or the GBL as well? Both. Okay. Well, the deceptions here, first of all, the New York GBL does not have a knowledge element. If we prove knowledge, we can get trouble damages under certain circumstances, but there's no knowledge element, so it does make actionable claims that involve inadvertent conduct. We have alleged knowledge here, both generally and specifically, through the deceptive concealment of the fee schedule, misrepresenting the terms on which this schedule had been updated. When you say deceptive concealment, could you be more specific about that? Sure, Your Honor. On the fee schedule specifically, the materials suggested that consumers could visit GHI's headquarters in person to inspect the schedule, but the complaint alleges in paragraph 27 and 7 that that was not true. They have an office over by the Lincoln Tunnel that you can allegedly go inspect the schedule. I don't go near the Lincoln Tunnel. The traffic is insane. Couldn't they also go online? They could not, Your Honor, and they also could not access this information when they called. They were not provided access. Where this is alleged is in the changes that were made to GHI's practices towards these insureds as a result of the New York Attorney General's assurance of discontinuance. One of the primary avenues of prospective relief that the Attorney General ordered was the creation of a member portal on GHI's website that allowed members to look up. I don't know, and I can't represent if it was every single potential procedure, but it was many common procedures. Is it that circumstance that is a basis for your fraud claim? Which circumstance? They said that they had the information, you could check it, and it's in an office somewhere near the Lincoln Tunnel. Well, we haven't brought a fraud claim, and we're not required to prove some of the more heightened... Representation. Yes, it's a misrepresentation, and it's primarily, as far as the availability of the schedule, that is a misrepresentation, but they also omitted to inform insureds of the frequency with which this fee schedule was updated, the fact that it had no relationship to what is a typical PPO plan's payment scheme, which is usual and customary rates. And omissions are equally actionable under the GBL. What the New York courts have said is that's particularly true where the information that would have been highly material to reveal to consumers is uniquely within the defendant's conduct, and that is exactly what this fee schedule was. It was their proprietary schedule of reimbursement rates that they did not make available to consumers. So there was no way for consumers to adequately figure out for different services that they might incur in the future if they chose to go out of network under this plan that was marketed specifically as a comprehensive PPO with the freedom to choose any provider worldwide. Did Mr. Parvin show in the district court that he himself suffered a harm, that is that maybe he submitted a claim that was not properly paid? Yes, he did, and that's in paragraph 41 of the complaint, and that element, injury, is undisputed by DHI at this stage, or at least it was not raised in the district court below or on this appeal. I see my time has expired. As far as you've seen, we've not been going crazy when the red light comes on, but there's another point you feel compelled to make. You don't have to keep going, but if you feel that we haven't been treated fairly in terms of not getting a chance to get something out briefly, briefly, briefly, go ahead. If I may make one other point. While I'm here, Judge McKee, thank you very much for your time. There is another aspect of the plan that was highly misleading. It was the sale of this additional rider to provide increased and enhanced benefits for out-of-network coverage, and what GHI didn't tell consumers in this summary that they provided when they were trying to sell this additional coverage was that it excluded entirely all outpatient out-of-network services, which accounted for 65 percent of members' out-of-network expenses during the class period, and this was information they could have easily put in there. They could have said this rider covers certain in-patient out-of-network expenses, but instead they failed to reveal this information that would have been highly material to insurers trying to decide, do I want to shell out even more money for this plan to provide additional financial security for my family? When you come back, if you come back, you can tell me where you have alleged that group health knowingly violated New York's insurance law. Well, he may know something I don't, because you did save time for a bottle, I think, and he's saying if you come back, so he may know something about that chair. I may not want to sit down. I'd be happy to answer that very briefly now, or why don't you wait till you come back? Good morning. Good morning, Mr. Beeson. Pleasure to see you. Pleasure to be here. Equally weird. I want to, at the outset, tell the court, it's John Gleeson for the athlete, at the outset say it's our position and it's strongly felt that there are no misrepresentations here and no misleading comments that are complained about. But I'd like to be a brief guess into that, hopefully with a locker. Mr. Orson made an excellent argument, and I'm not sure whether or not it's convincing or not, but it's really, really a wonderful argument. Thank you. What about a locker in Millennium? How does that case not mean that you lose? It means it doesn't require us to lose at all, Judge, because there's a very distinctive aspect to this case that I'll suggest to you, even if we assume for argument's sake that there's some difficult cases with respect to what's consumer-oriented conduct and what isn't, shouldn't get in the way of us deciding the easy ones correctly. And the reason this is an easy one is there's no collective bargaining, there's no intermediary in those cases that levels the unequal bargaining power playing field that lies at the heart of the GBO. Well, that's what I thought, but Ms. Joseph shot me down on that. I thought persuasively, and she said, look at the statute, and that's not required. What I would like to do is invite the Court's attention. I think there are two New York Court of Appeals cases that place, in very sharp relief, my suggestion to this Court that the fact that this was a negotiated contract of insurance between the city, which pays for it, and the unions, which represent Mr. Plavin and the other employees and retirees on the one hand, and my client, GHI, on the other, falls clearly on the not consumer-oriented side of the line. Well, the softball that I threw to Ms. Joseph... And was handed it to her. I think it demonstrates, excuse me, my concern that although the underlying contract was negotiated between GHI and the city and the union, that the consumer-oriented conduct in question here was the communications from the insurance company directly to the insured, to the union members, that to induce them, number one, to pick the GHI contract when they selected among the contracts available to them, and to get certain extra coverage, which the Plavin complains was not accurately represented in the materials sent not to the city or the union, but sent directly by GHI to the insureds. First, Judge, let's be clear about it. The information about which Mr. Plavin complains wasn't sent by GHI. It was sent by the city itself. If I can invite your attention... Excuse me, Judge. I thought it was the city that sent it out. But go ahead. If I can invite your attention to page 326 of the record, the summary program description on which this lawsuit is based is authored by the City of New York Office of Labor Relations Employee Benefits Program, which negotiated with the municipal unions, negotiated to obtain the terms of this insurance with GHI. They're the ones who make the representations in the summary program description. But more important than that, let me... And if I may invite the court's attention to the two New York Court of Appeals cases decided 10 months apart that support my argument completely. The first is the Oswego case where people walk... It's kind of an adorable case because it's back when they actually had interest for savings accounts. People go into the bank, they receive generic descriptions of the savings account, and then there are the account cards that Judge McKee referenced. And the court there finds consumer oriented conduct because everybody gets handed standard documents. Every single customer is handed the same document. And the deceptions about the interest are offered to the public at large. Ten months later, the same court decides the NYU case. That case, like this one, involved a contract of insurance negotiated by sophisticated parties. And the terms like this, not generic, they were specifically tailored to the needs of the insured. I'm going to invite the court's attention to where that is precisely said in this document. That's very different, though, because that was a direct contract between NYU, right? And the insurer. But that's not the case here. Well, yes, it is a direct contract here between the city. Not between the members. The union, they're saying. It's between the city and GHI, all for the benefit of the members. But this is a claim by Mr. Plavin directly. It's a class action, yes. And he's the third party beneficiary of the contract of insurance. But if I can just finish this one thought, please, Judge. What the Court of Appeals says in NYU, and this is a quote, this transaction is wholly unlike that in Oswego, which involves standard forms and advice supplied to the consuming public at large, and in which the parties occupy disparate bargaining positions. The company, as opposed to the general public. And then the court goes on to say that the case before the court is a private contract dispute unique to these parties, not conduct involving a consuming public at large. So the key, the reason for consumer protection laws generally, including in New York, is to rectify that disparate bargaining power between. So you've got the union members and you've got, what, 900,000 or so. Can they be considered consumers under the law? We're all consumers under the law, Judge. But with respect to a complaint regarding. With respect to this health insurance, can they be considered consumers under the law? For the purposes of GPL? No. The conduct towards them, in this case, because of the intermediaries, the sophisticated parties, their own unions and their employers, the conduct of which they complain is not consumer oriented. So we have we have a choice of 11 different insurance companies. And I gather that what was the union or the city provided to the employees what your choice is. But the complaint here is that this choice was skewed because of misrepresentations in what the GHI policy would provide. And because the information was misrepresented as to what sort of, for instance, inpatient outpatient services were covered, what what the out of network costs would be. Now, this information, was it ever supplied directly from GHI to the union members? Sometimes when there were changes. If I can invite the court's attention to a letter. These are common. There's several of them in the joint appendix. And I'll provide the sites in a moment where when there was a change in the coverage that was. Let me get it to the court. OK, now these letters. Don't worry about it. Don't take it. It responds to these letters. Did they contain any of the misrepresentations that the plaintiffs that Plavin is complaining about? No. All right. But did any information, you've heard the complaints about misrepresentation of information. Now, whether I'm not asking you to admit that there are misrepresentations, but this communication, did it go through the city of New York from GHI or did it go directly from GHI to the insureds? It goes from the city to the insureds. OK, so it goes from GHI to the city first, because otherwise the city wouldn't know. Well, no, the city negotiated its terms, which is precisely my point. But it got that information from GHI. Well, yeah. OK. And then it passed it on to the, and for instance, the rider to get out of network coverage. Was that made directly to the insureds by GHI or did that go through the city? That representation is in the same summary program description. OK, but that information in the summary program description, where did that, did that information come directly from the city or did it go from GHI through the city to the insureds? The city, what's in the record is an allegation that the GHI drafted that language. And I'm not suggesting that that matters even. What happens is, and if I can... OK, but what I'm asking you is, having drafted that language, did they communicate it directly to the insureds or did they communicate it to the city who then... Passed it out to the insureds. It's in the summary program description provided by the city to its employees. OK. Who drafted the summary plan discussion? Was that the city and GHI together? The allegation is that the GHI drafted it. But let me suggest this. Take any union. The Teamsters union negotiates with Blue Cross Blue Shield for insurance for the Teamsters. That's specifically tailored... The legislative office of the courts negotiates for insurance for judges. I understand the concept. They finish the negotiations. It's the fact that there are sophisticated parties negotiating the terms of the insurance that renders the GBL inapplicable. But of course at the end of that process, whichever union it is, is going to say to whichever insurer it concludes negotiations with, all right, draft up the terms of what we agreed to on behalf of our members. So who drafts it passes in the night, I'll suggest to you, with the heart of what makes the GBL applicable, which is the absence of something to rectify the disparate bargaining power between the insurance company and the insured. I'm not suggesting that there aren't cases out there where there is a proper application of the GBL to insurance contracts between insurers and members of the consuming public. But in those circumstances, there isn't this collective bargaining agreement apparatus. The complaint here, I'll suggest respectfully to the court, this is why you don't see any of these cases. The Alacoa case, none of these cases involving the GBL involves someone, involves a complainant who was represented by his or her own union pursuant to collective bargaining in negotiating the terms of the contract. And that's because in that setting, there is no disparate bargaining power that we think will victimize the consuming public. Here we have the unions, municipal unions, they're pretty strong in New York. The City of New York Office of Labor Relations, they're acting on behalf of Mr. Plavin. So would you say that the union is the proper party in this case, not the union member? Is that what you're suggesting? Mr. Plavin could be a proper party. He could, for breach of insurance coverage, he could make that claim. If there were some fraud in the inducement, I suppose. But this is a contract of which he is obviously, he and all his fellow former city employees, obviously the third party beneficiary, he could bring a claim of a breach of coverage. He could, so he has his remedies. But it's not a GBL remedy. Let me give you a hypothetical. GHI is one of ten companies selected by the City of New York and the union to provide insurance coverage. And of course, GHI wants to get the lion's share of employees signing up to get its coverage. So it negotiates with the city and with the union to create what its program will be. But then in order to get more people to sign up, when it prepares its brochure to go to the union members, it misrepresents what is being offered by its plan. Is that a misrepresentation to consumers because it will go through the city, but directly through the city to the consumers to induce them to sign up for GHI's program as opposed to the other ten programs that are being offered? If it's a negotiated contract of insurance, I'm not against the law of the state of New York, because in that context, by definition, when there are sophisticated parties negotiating the insurance to a closed set of members of the plan, that is by definition not conduct aimed at the general public. It doesn't matter if there are five people in the union or a million people in the union. It distinguishes itself from the core principle operating in Oswego. Is this because they're union members or is this because the contract was negotiated between people other than the union members? It means because the contracts were negotiated by their own unions and their own employer, and they were not involved in that. And therefore they were not subjected to the evils of district bargaining power. We weren't involved in the negotiation, but what we are presented with to induce us to sign up is a misrepresentation. I understand the court and the way that works. This is why, with all respect, this is why you don't see me from Brooklyn. Their beef is with the union. Their union's not taking good care of them because their union and their employer are sending them incorrect information. That's how they might have a coverage claim against the insurance carrier, but their beef in terms of misleading missives about the coverage that their employer and their union negotiated for them is with the union. That's really why you'll never see, you'll not see a case under the GPL involving a union member's claim against an insurer where it was negotiated by the unions and the employer. If I can make one more reference. This is the, what I meant to invite to your attention earlier and I didn't have the site. Here's a missive sent directly to Mr. Playman because he's a member that announces a change in the policy. Dear, this is at page 309, Dear City of New York Employee or Retiree, as a result of negotiations between the City of New York Labor Relations and the unions represented by the Municipal Labor Committee, the following benefit changes will become effective on April 1st, 2004. There is a significant dispositive intermediary between my client, defendant in this case, and the would be plaintiff under the GPL. That is what makes this case with all respect on the consumer oriented conduct easy. I see. You notice me. Yeah, go ahead. Go ahead. I think to make group health that judgment proof. I mean, you really want to go to GPL. Yeah, I'm sorry. Yes. Yeah. You could never file a claim against the insurance company for fraudulent misconduct. The union hasn't hasn't bought. Are you saying that the union is the proper party in this case? Assuming the set of conduct misrepresentation. Well, they the plaintiff can seek whatever recourse is available to him. They as a practical matter. So you're suggesting that the bargaining power bargaining parties are the insurance insurance company and the union. Yes. The union is the proper party to bring any claims of misrepresentation. And union is on our side on this. Can I. What if the union member relied on certain misrepresentations and to his or her detriment? Doesn't the union member have a claim against the insurer? Might have a claim against its own union. It would have a claim against the insurer. But it's union. I'm sorry. It's the health group that is issuing statements upon which the union member relies. There might be. That's the complaint. Understood. Excuse me. There might be a breach of coverage claim if the terms of the that are allegedly incorrect promised coverage that doesn't it is a breach of coverage claim. I'm just focusing based on what Judge McKee mentioned right at the outset of Miss Joseph's very able argument. The limitations of the GBL claim. It's a it's a consumer protection claim. And here the consumer to play them is not dealing directly with a company that has disparate bargaining power. He has very important negotiators working on his behalf. If I can just take a moment, I want to I want to please apprise the court of how these things work together. This GBL, the attorney general general is one of our regulators. And here the attorney general doesn't find fraud or misrepresentations or deception except for the one statement about whether the 1983 schedule has been amended. And there the attorney general itself didn't dispute the accuracy of our statement, but rather the the grovelment of the of the proceeding that resulted in the assurance of discontinuous isn't is a complaint by our regulator. We deal with them on a regular basis that we were providing insufficient information about the availability of insufficiently providing the availability of the plan, insufficient information about the limits and the reimbursement of out of network coverage. Well, it's not insufficiency. I think the plaintiff's claim is inaccurate information. That's the plaintiff's claim. But that's not what the the attorney general on the assurance of discontinuance even says, Judge. That's what they say. It's not what the attorney general said. But here and the third insufficient information that the attorney general found problematic was these unintended out of network providers. So if you if you go to have a procedure in the hospital, maybe the anesthesiologist is out of network and you might not know that we're a company. We take the the attorney general, the health bureau of the attorney general's office in New York has almost 6000 complaints a year, resolves about 2900 of them. We go in and we say, of course, we'll do this. We'll provide more information. So it's not insufficient. And we did that. We did that as part of the assurance of discontinuance. Do we disagree with the applicability of the GBL, which, by the way, when the attorney general enforces, it has a much lower standard. It protects the ignorant, the unthinking, the credulous. Do we disagree with all that? Yes. But did we want to comply with our regulator? Yes, we did. And it produced an assurance of discontinuance. That's how these get resolved. You mentioned the attorney general, though, but aren't the pleadings in this case presumed to be true for purposes of a motion to dismiss the all well-pled non-conclusory factual allegations are. But to the extent those factual allegations rely on inferences to be drawn from statements that are before the court, just as Judge Mariani did. Judge Mariani looked at these statements, looked at them in context, applied the much more stringent standard that's applicable to this case than was applicable before the attorney general and concluded that no, that as a matter of law, no reasonable person, reasonable consumer acting reasonably could be misled in any material way by any of these statements. And that's entirely appropriate on a motion to dismiss. If I can just finish the thought about the situation this puts us in. Just briefly. We cooperate with our regulator. We agree to provide the information. The Oswego case, Judge Judith Kaye's statement in the Oswego case about how the last thing the New York legislature had in mind was a tidal wave of litigation. Once there was a private right of action added to the GPL. Please keep in mind the incentives that companies like ours will have to cooperate with regulators to provide the more sufficient information they ask for. If every time we do it, the assurance of it's a much lower standard. We're trying to do the right thing. And I respectfully suggest that the way the GPL works, the way the lower standard applicable to the attorney general's investigations work and the higher standard that was deliberately intended by the New York under New York law to restrict this type of case is why this type of case should be restricted. Thank you. Thank you. Judge Quintus, I first want to address the question you asked me about where knowledge for 4226 is pled in the complaint. It's pled generally in Paragraph 69. We know that even under Rule 9B, knowledge may be alleged generally, and that's precisely because it's a fact question that's uniquely within the defendant's possession. I would also submit that Paragraph 27, which talks about the purposeful concealment of the fee schedule, supports an inference in our favor on the knowledge that this information, if actually revealed to consumers, could have a material effect on their insurance purchasing decisions. Judge Roth, you asked about the source of the information in the summary program description. Paragraph 22 alleges that GHI prepared this information. It was compiled into a booklet that had all 11 plans descriptions and then provided to the consumers. Say who. The actual booklet was provided by the city, but there's more. The second document that we're talking about here was available on GHI's website, so that was directly available to consumers. The third aspect that was available on the union site. I assume that the New York neighborhood, whatever it is, does not have its own website for this purpose. I believe there's a website where you can click on a link to GHI's program specific to the New York City Comprehensive Benefits Plan. I believe there is a public-facing aspect of that website where these materials were available. Where's the link on whose website? Where's the link? I understand from Mr. Gleason's perspective, but it doesn't matter because this is not, this is an NYU situation, sophisticated parties. But assuming that we get down to the level of these folks, consumers, within the meaning of the GBO, where's the link on whose website? GHI's website or Emblem Health. I should try to do this. I go on the website, click on GBO's website. That takes me to the city site or that takes me directly to the SPD? No, Your Honor. It's a GHI or Emblem Health www address and it has information prepared by GHI for these consumers. What counsel emphasized in his argument was the policy terms and maybe we have a claim for breach of contract. This is not a claim about the terms of the policy. Whatever the negotiations and whatever the contract actually provided, GHI was not then permitted to either misrepresent the terms of out-of-network coverage or omit highly material information from these materials that were provided to insureds to make their coverage decisions. Let me ask you, other than the website, GHI website, did GHI in any way communicate directly with the insureds? Our position is that the document that they prepared, that is included. It went through the city? The document was physically distributed by the city, but the allegations and the complaint are that those are GHI's words describing their program. And perhaps, as counsel suggested, our position is that whatever the terms of the contract are, they are irrelevant, but they weren't permitted to misrepresent what those terms were. And that's what they did here. I assume that the plaintiff relied on the representations made by the insured? Reliance is not an element of the GBL or 4226 claims and the Stutman versus chemical... Representation itself is sufficient? Correct. And that's because the deceptive practices that the legislature in New York was trying to combat were varied, and they weren't dependent on some common law fraud notion. In fact, the courts repeatedly say in the Oswego case and Guidon, this act covers conduct that does not rise to the level of common law fraud. And just to give one example, we haven't had an opportunity to touch on this much today, but the Guidon case in the New York Court of Appeals two times, in 1999 and 2001, originally involved both fraud and GBL claims in an extensive marketing scheme to mislead consumers about vanishing premium illustrations. And the court there said, this conduct doesn't rise to fraud. You can't bring your fraud claim, but you can bring your GBL claim. And they recognize that this covers a much broader range of conduct that doesn't include falsity. I heard counsel say once or twice that we haven't alleged that any of the materials were false or fraudulent. Well, that's simply not an element here, and we're not required to prove that. What we are required to allege, and again, we're at the pleading stage, we're only talking about plausibility, is that these statements have the capacity to mislead or are likely to mislead a reasonable consumer under the circumstances. Yes, I'm looking at www.emblemhealth.com. Is that the same website as the GHI website? I believe, yes. I don't have it here today. It's the same as a class member would have seen. So I do believe that is the website. If you look at the summary program, summary of benefits and coverage at Appendix 84, even though it's the GHI plan, the top says Emblem Health, City of New York, basic program. I see that my time has expired. May I address two other points very briefly? It will be really brief. Counsel said there's no case involving a union bringing GBL claims on behalf of its members. That's not accurate. We cited the American Medical Association case versus UnitedHealthcare. In that case, whether the consumer-oriented element had been satisfied was not challenged by United. What United did say is... Can we have the cite on that one? I don't have the citation, but it is in our brief. The defendant there actually challenged the union standing to bring these claims on behalf of the members. The court rejected that, but under counsel's formulation, maybe the unions can bring it, but the consumers can't. But the practical effect is no one can bring these claims, and only if you have a contract claim are you able to seek relief, and that's just not the law here. You lost me there. I'm not sure I followed that. Say that again? In that case where the defendant... Mr. Gleeson suggested that perhaps the unions have a claim. That was in response to questioning from you, Judge McKee. I just don't know where this drawing of lines ends under this very broad statute. If you start saying, okay, well, where you're represented by a union, you can't bring the claim, but maybe the union can say you misrepresented the terms of the plan, or you didn't give us what we asked for. I'm not sure what that would look like. There may be relief out there. It's not a GDL claim. The other point was the Attorney General's assurance of discontinuance. Mr. Gleeson said a different legal standard applied under the Schneiderman v. Orbital Publishing Group decision, and the Spitzer v. Applied Card Systems decision. The New York courts made clear that the AG, when prosecuting a GDL claim, is subject to the reasonable consumer standard. I remember I saw somewhere where I was reading that a welcome back to lower standard was a really low standard. Schneiderman? That came from that case, but if you look lower down in the paragraph, what the court was addressing with the ignorant consumer standard was an action under Executive Law 63-12. The AOD here was brought under both that executive law and the GDL, sections 349 and 350, and for the court to have found violations of both of those laws, it was necessary, not for the court, for the New York Attorney General to have found that those violations constituted. Was there a finding of a violation here, or was it just like a consent decree, entered into with no admission of wrongdoing? There was a finding that GHI did not admit or deny, but the AOD, if you look at. The finding of insufficient information. That's not the only finding. If you look at paragraph 22 of the AOD, which is on appendix 173, the header is GHI misrepresents the frequency with which the schedule is updated. So there was a finding of misrepresentation. And additionally, on the other conduct of GHI that the Attorney General found was improper here under the GDL, those fall generally within the camp of omissions. Mr. Gleeson did say that perhaps the union is the more appropriate party in a case like this. Is it your position that the harm itself from the misrepresentations are harms to the union members or the union? To the members. And that's because we're talking about GHI's communications with these consumers, not about the negotiations or the terms of the policy. But they're communications through the city, right? There's no allegation or any information in the record that the city approved those, other than saying... No, but I mean, it's not like they're putting envelopes in the mail. GHI's putting envelopes in the mail and mailing them to the insurers. It's they're providing information to the city that then puts on its website concerning the insurance programs offered, what the new information is. The first document, the SPD, is provided through the city. Yes. The second document is provided directly by GHI on its website. But in both instances, that is the allegations and the complaint are that GHI created those documents. And just to end on one point. If this court extends the New York University case to the situation and we submit that it would... You put the magic language and you say, this case extends. It may well be that it already applies as the court of appeals would without our extending it. Your Honor, I hear the point, but respectfully, I think that finding or conclusion would result on writing Mr. Plavin out of the transaction. We can't say that because it would result in you losing. I'm not saying that you do lose, I just don't know. It's a really difficult case. I often say that diversity contract cases like this are interesting, but this is very interesting. It's actually not really diversity, it's an interesting case. I want to thank you for your argument.